IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:23-CR-172 |
| | ) | |
| ELISHA JASON ALBERT, | ) | The Hon. Michael S. Nachmanoff |
| | ) | |
| Defendant | ) | Sentencing: May 16, 2024 |
| _____ | ) | |

## UNITED STATES' POSITION ON SENTENCING

The United States of America, by and through its undersigned counsel, hereby submits its position on the sentencing of Elisha Jason Albert ("defendant"). The defendant has pleaded guilty, without a plea agreement, to every count alleged against him in the indictment: sexual exploitation of children, in violation of 18 U.S.C. § 2251(a) and (e); attempted coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b); travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) and (e); and transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1). The applicable guidelines range has been correctly calculated in the Presentence Investigation Report ("PSR") as life imprisonment, with a statutory maximum range allowed also of life imprisonment. *See* Dkt. No. 91 (PSR), at Part D. For the reasons that follow, the United States submits that a sentence of 35 years is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C. § 3553(a). The Court should further impose a lifetime term of supervised release, forfeiture of the electronic device used in connection with the offense, and restitution and special assessments as set forth by statute.

## I.     THE DEFENDANT PREYED UPON SEVEN MINORS IN JUST TWO YEARS

### Minor 1: 15-years-old, Virginia

The communications between the defendant, a then 24-year-old Texas resident, and Minor 1, a 15-year-old Virginia resident, began around August 25, 2023, and concluded with the defendant's arrest on September 25.  *See generally* Gov. Exs. 1A (Snapchat) and 1B (iMessage). On September 22, 2023, the FBI arranged for a Child Adolescent Forensic Interview (CAFI) of Minor 1 after her guardian submitted an online tip to the FBI.  During this interview, Minor 1 disclosed having plans to meet with an individual for the purposes of sex on or about September 23, 2023.  This individual was identified as the defendant.

The FBI then reviewed the Snapchat communications found on Minor 1's phone between Minor 1 and the defendant, using the display name "Jordan."  Initially, the defendant made explicit requests for Minor 1 to send him sexually explicit material:

> JORDAN: U sell?
>
> JORDAN: Also, how old r u
>
> MV: Yes I do
>
> MV: How old do you want me to be?
>
> JORDAN: Its better if u don't answer then
>
> JORDAN: Oh yea? What u got?
>
> MV: Whatever you want
>
> JORDAN: Depends what u have
>
> MV: Tell me what you want and I'll lyk
>
> JORDAN: Everything u have :)
>
> MV: What are we talking about exactly

JORDAN: You tell me

MV: Stop that and js tell me

JORDAN: Haha ok ok

JORDAN: Videos?

MV: Like nudes?

JORDAN: Precisely

Gov. Ex. 1A at 1.[1]

The defendant then purchased Minor 1's entire existing inventory of material:

JORDAN: What do you have saved?

JORDAN: Bit tits indeed

JORDAN: I'd slap it :)

MV: Bet

JORDAN: ?

MV: Videos of me playing with my pussy, tits, I

MV: have a bottle that I use as a dick and suck it

MV: too, whatever you want

MV: I can slap my tits, ass,

JORDAN: I'll take all your vids

JORDAN: My thing

JORDAN: Is

JORDAN: The nastier the better

---

[1] Unless otherwise noted, all page numbers refer to the page numbers marked on the bottom of the exhibit.

> MV: Js tell me what you want
>
> JORDAN: Sloppy, spit, squirting, u talking dirty, slapping
>
> JORDAN: yourself etc
>
> JORDAN: Is that something u can handle?
>
> JORDAN: First send me everything u have saved and i
>
> JORDAN: can cashapp u

*Id.*

On August 27, the defendant first raised the idea of having sex with Minor 1: "When was the last time u got dicked down." *Id.* at 2. When Minor 1 responded that she had never had sex before, the defendant responded "That's good[,]" "I can change that[,]" "I will[,]" and "I wanna be your first[.]" *Id.*

Over the next few days, the defendant instructed Minor 1 to "Show me what u have on rn [right now]" and to "spank yourself." *Id.* at 3-4. Minor 1 expressed interest in piercing her lip but stated she didn't have enough money. The defendant therefore sent her money. *Id.* at 4.

The defendant tried again on August 30, demanding that Minor 1 "Show me what u have on rn." *Id.* The defendant then told Minor 1, "Too many clothes love," and "You should change that :)[.]" *Id.* At approximately 8:36pm,[2] the defendant instructed Minor 1 to "take out your dildo" and told her to "slowly put it in your mouth for me princess." *Id.* at 4-5. Minor 1 asked if he wanted to see; the defendant responded "Yes," and proposed, "Or you can make a video for a few mins where you give the sloppiest head ever while gagging on it." *Id.* at 5. The defendant clarified that was not all he wanted—he also said "I want you to slide it deep inside your ass while your fingers go inside your pussy." *Id.* Minor 1 stated that because of her menstrual

---

[2] All times are in Universal Time Code (UTC), which corresponds to Greenwich Mean Time.

cycle, she did not want to penetrate her vagina, which the defendant accepted.  *Id.*  When she clarified, "So you want me to play with my ass only," the defendant replied, "Yes. The harder and sloppier the better."  *Id.*  At approximately 8:44pm, Minor 1 asked if she would be paid, and the defendant responded, "Do a good job and you will princess."  *Id.*

At approximately 8:55pm on August 30, 2023 (just 11 minutes after the defendant promised to pay Minor 1 if she did "a good job"), metadata from Minor 1's phone indicated that a video was created lasting approximately four minutes and depicting Minor 1 performing oral sex on a dildo ("Video 1").  At approximately 9:00pm, Minor 1 informed the defendant on Snapchat that the video was too long, and that she needed his phone number to send it by text. *Id.*  At 9:02pm, the defendant received a text message from Minor 1 containing Video 1.  *See* Gov. Ex. 1B at 1.  At 9:17pm, Minor 1 asked if the copy of Video 1 he received was blurry, and the defendant confirmed that it was.  *See* Gov. Ex. 1B at 5.

Minor 1's phone also contained a video lasting approximately three minutes depicting Minor 1 anally penetrating herself with a dildo ("Video 2"). The metadata indicates that Video 2 was created at 9:08:28pm on August 30.  At 9:08:55pm, the defendant received a text message from Minor 1 containing Video 2.  *See* Gov. Ex. 1B at 2.  At 9:17pm, the defendant received a copy of Video 2 from Minor 1 via Snapchat.  *See* Gov. Ex. 1A at 5.  The defendant replied that he "loved it when u turned around," apparently referring to a portion of the video in which Minor 1 rotated from facing away from the camera to facing the camera.  *Id.*  The defendant then suggested, "U should grab it and shove it deep inside you as you lay on your back."  *Id.*

On September 7, 2023, Minor 1 told the defendant that she was fifteen; he lied to her and said that he was twenty-two when in fact he was about to turn twenty-five.  *Id.* at 6.  Confirming

Minor 1's age did not deter the defendant.  On September 15, 2023, they had the following

exchange:

> JORDAN: U have something for me?
>
> MV: Not yet
>
> MV: But I can make stuff tmr
>
> MV: Well I do have this

*Id.* at 7.  At this point, the defendant received three videos of child sexual abuse material. The

defendant then stated his desire to sexually abuse Minor 1 in person:

> JORDAN: Sit on my face my little girl
>
> JORDAN: I wanna see you destroy your tight little holes
>
> JORDAN: U understand?
>
> MV: Yes I understand
>
> JORDAN: Good girl
>
> JORDAN: I'll send u something tonight :)

*Id.*

In addition to seeking out sexually explicit material, the defendant initiated plans to visit

Minor 1.  On September 7, 2023, he first proposed a meeting on the 23rd:

> JORDAN: U want me to come see u princess?
>
> MV: Yessss
>
> JORDAN: Okay i'll come on the 23rd
>
> JORDAN: Im gonna look at all of that when I get homee
>
> MV: Okay
>
> JORDAN: Okay i'll come on the 23rd

*Id.* at 5-6.  On September 15, the defendant told Minor 1 that he was actually coming on Sunday, September 24:

> JORDAN: Im coming to you Sunday the 24th ok?
>
> MV: Alr

*Id.* at 7.  On September 18, 2023, the defendant again confirmed their plans for that Sunday:

> JORDAN: Heyy
>
> JORDAN: So i'll pick u up around 1 pm on Sunday?
>
> MV: Yeah

*Id.*  Minor 1 specifically told the defendant "[w]e can't leave my neighborhood[.]"  *Id.*  Finally, between September 20 and 21, 2023, the defendant again confirmed his plans to travel that weekend:

> JORDAN: You excited to see me this weekend?
>
> MV: Yeah

*Id.*  Although the FBI identified "JORDAN" as the defendant, who resided in Texas, Minor 1 confirmed that the defendant told her he was coming to the area for a wedding, thus explaining his presence that weekend on the east coast.

On September 22, 2023, the FBI took custody of Minor 1's phone, and an Online Covert Employee (OCE) posing as Minor 1 continued to communicate with the defendant over Snapchat.   When the meeting with the defendant did not happen on September 23, the OCE followed up on September 24.  The defendant responded and told the OCE to "text my number."[3]

---

[3] Snapchat is an app designed to erase messages and media, one of the reasons it is so popular with those engaged in illegal conduct.  Here, other communications occurred with the defendant over Snapchat prior to the switch to iMessage which self-deleted and are not captured in the Snapchat search warrant returns.

*Id.* After the OCE did so, the defendant almost immediately proposed a meeting on September 25, and they arranged to meet at a Giant grocery store in Haymarket, which the OCE said was a "shopping center down the road" within walking distance. *See* Gov. Ex. 1B at 12-22.  During the discussions, the OCE stated: "I don't want to get pregnant tho." *Id.* at 18.  The defendant assured the OCE, "You won't don't worry about that" because "I wont finish inside u." *Id.* at 19.

On September 25, the defendant drove approximately five and a half hours from Long Island, New York, to Prince William County, Virginia.  During the course of his drive, he texted the OCE regular updates on his location and progress, including sending pictures from along the route. *Id.* at 27, 28, 29, 31.  The defendant was arrested upon his arrival in the Giant parking lot.

After his arrest, the defendant consented to be interviewed.  After repeatedly lying and claiming not to have known Minor 1's age, the defendant admitted that he did know she was fifteen years old.  He admitted that he was the person on the other end of the Snapchat and iMessage conversations with her and the FBI agent who took over her account in the four days leading up to the defendant's apprehension.  He further admitted that he only traveled to Virginia to meet with Minor 1 and his words and intentions were sexual in nature.  Nonetheless, he claimed that he might not have "gone through with it" once he had arrived and further that he had only ever met women over the age of 18 for sex in the past. *See generally* Gov. Ex. 8. This last claim was also a lie, as discussed in additional detail below.

At the time of his arrest in Prince William County, the defendant had with him his phone, which contained a folder titled "good videos" that stored approximately sixty-four videos of young children engaged in sexually explicit conduct.  These videos included minors as young as 4-6 years old engaged in penetrative sex, lewd and lascivious displays of their genitals, and

bondage.  The defendant's phone also separately contained one of the videos produced by Minor 1 on August 30.

By the time the defendant was communicating with Minor 1, he was already a seasoned predator.  The defendant's phone had iMessage communications with other apparent minors between fifteen and sixteen years old, which included additional production of child sexual abuse material and coercion and enticement.  *See generally* Gov. Exs. 2-7.

### Minor 2: 15-years-old, Texas

First, between August 2021 and the time of his arrest in September 2023, the defendant engaged with a minor in Texas ("Minor Victim 2" or "Minor 2").  Their abbreviated iMessage communications appear at Gov. Ex. 2.  On August 14, 2021, the defendant acknowledged that Minor 2 would not be eighteen years old for "2 and a half years."  Gov. Ex. 2 at 2.  Nonetheless, in addition to copious "sexting," the defendant and Minor 2 met in person for sex on approximately three occasions.  On September 6, 2021, the defendant drove to Minor 2's home and had sex with her.  *See id.* at 3-10.  The next day, Minor 2 told the defendant "i'm so sore[,]" "it hurts so bad[,]" "i'm sitting weird cause it hurts so bad[,]" and similar statements making it clear that the two had a penetrative sexual encounter.  *Id.* at 10-14.

The defendant met on two subsequent occasions, during one of which the defendant filmed himself having vaginal intercourse with Minor 2.  The second visit was on September 24, 2021.  *See id.* at 21-22.  The next day, Minor 2 told the defendant "it's a little hard to walk other than that I'm great[]," to which the defendant responded, "Loved fucking your brains out last night."  *Id.* at 28-30.  The third encounter was on October 23, 2021.  *See id.* at 31-33.  The next day, Minor 2 reported to the defendant that "it hurts to sit down[.]"  *Id.* at 36.  She also asked, "did you even watch the video[,]" apparently referring to the video that the defendant had made

of himself having sex with her.  *Id.*  When Minor 2 asked the defendant why her legs were shaking so much, he replied, "Because I fucked your brains out[.]"  *Id.* at 38.  In December 2021, Minor 2 asked the defendant to "send me the video of you pounding my pussy[,]" which he sent over Snapchat.  *Id.* at 41-43.  In January 2022, the defendant told Minor 2 that he lost the video when he got a new phone and asked her, "Can we make new ones[?]"  *Id.* at 54.  However, in December 2022, he found it and sent it to her.  *Id.* at 55-56.  This video was found in the defendant's phone, which he brought with him into the Eastern District of Virginia on September 25, 2023, and it is intrinsic to the transportation of child pornography charge in Count Four.

There were several similarities between the defendant's conduct with Minors 1 and 2. First, the defendant knew that Minors 1 and 2 were both 15 years old at the time of his primary interactions with them.  He also used consistent descriptors, including "baby" and "princess," to refer to both.  He discussed sneaking into both minors' homes.  *See* Gov. Exs. 1A at 7, 2 at 44-52.  Furthermore, as detailed above, the defendant was prepared to – and in fact did – travel for hours to have sex with both minors.  With Minor 1, he drove from Long Island, New York, into Prince William County, Virginia – a trip that took him approximately five and a half hours. With Minor 2, on one occasion he drove four hours each way from his then-residence in Dallas; on the others, he drove one hour from Austin and then the four hours home to Dallas.  The defendant also created sexually explicit material with Minor 2 and requested it from Minor 1.

The defendant also lied to both Minors 1 and 2 to make himself appear younger – and thus closer in age to his victims – than he really was.  On September 7, 2021, the defendant was "nervous about your sister knowing" when Minor 2 told him that she had told her sister "we fucked and how good it was lol[.]"  *Id.* at 15, 16.  Minor 2 reassured the defendant, "i told her you're 17 cause if I told her your actual age she'd be mad[.]"  *Id.* at 16.  Apparently, the

defendant had told Minor 2 that he was 20, *id.* at 17, rather than his true age of 23.  Notably, while Minor 2 was later stoic from much of her CAFI, she broke down into tears after learning the defendant's true age.  Finally, the defendant told both minors that they did not have to worry about getting pregnant because he had (in the case of Minor 2) or would (in the case of Minor 1/the FBI OCE) pull out and not finish inside them.  *See* Gov. Ex. 2 at 18-20.

### Minor 3: 16-years-old, South Carolina[4]

Between August 2022 and May 2023, the defendant "sexted" and sought sexually explicit material from a 16-year-old girl ("Minor 3") in South Carolina.  *See generally* Gov. Ex. 3. Minor 3 told the defendant she was 16, and as with Minors 1 and 2, the defendant lied and told her he was 19 when he was in fact almost 24 years old.  *See id.* at 156.  As with Minor 1, the defendant asked Minor 3 for "all those videos of you" "touching yourself baby[.]"  *Id.* at 17-18. He also repeatedly asked her to take pictures of herself with her legs spread, despite her clear discomfort with his repeated requests for sexual material.  *See* Gov. Ex. 3 at 9, 83, 90, 102, and 103.  As with Minors 1 and 2, the defendant called Minor 3 "princess" and "babygirl," and he said he wanted to come visit her in South Carolina.  *Id.* at 61, 99.  Eventually, Minor 3 gave in and sent the defendant her "my eyes only" images, which she described as "all inappropriate stuff[.]"  The defendant responded that he loved these images, especially the "one of [Minor 3] squirting[.]"  *Id.* at 136-139.  Because none of the videos had audio, the defendant solicited the

---

[4] The Probation Officer declined to include summaries of the defendant's conversations with Minors 3-7 because she "did not see any evidence of the individuals' actual ages" and "did not see any evidence that the defendant attempted to coerce or persuade the minor to engage in illicit sexual conduct."  PSR at 31.  As detailed herein, these statements are not accurate, and the government continues to request that these summaries be included in the PSR.  They are relevant both to the offense conduct and also to the defendant's proclivities, information that is important for BOP and his future probation officer to know.

11

production of additional sexually explicit material, telling Minor 3 she will "have to make new ones." *Id.* at 140.

### Minor 4

Between December 2022 and his arrest in September 2023, the defendant groomed another minor ("Minor 4") and encouraged her to send him pictures of her. *See generally* Gov. Ex. 4. While this victim did not expressly state her age, the two talked about Minor 4 being in school and, as with Minors 1, 2, and 3, the defendant called her "princess." *See, e.g., id.* at 23, 40, 63. Minor 4 was another vulnerable girl whose "grandpa died 1 month ago" and who admitted to the defendant that she had been cutting herself. *Id.* at 7, 12. The defendant quickly assured her that he was "here for [her,]" before reverting to sexting, exchanging pictures, and talking about visiting Minor 4. *Id.* at 13.

### Minor 5

Between January and April 2023, the defended enticed another minor ("Minor 5") to produce sexually explicit content with language almost identical to his later demands of Minor 1. *See generally* Gov Ex. 5. While again this minor did not expressly state her age, the two talked about her being in school and living with her parents. *See, e.g., id.* at 2, 25. The defendant used Minor 5 to produce sexually explicit material. Specifically, he told her she "should keep going" after she shared a video of herself. *Id.* at 7. Then, in an almost exact word-for-word preview of the defendant's later requests to Minor 1, the defendant told Minor 5, "I wanna see you ride your dildo." *Id.* at 8. After Minor 5 apparently complied and sent a sexually explicit video of herself, the defendant told her to "turn around and bounce your ass up and down that dildo u little slut[.] U understand?" Minor 5 apparently created a compliant video and sent it, exactly as Minor 1 later did. *Id.* at 9. As with Minor 1, the defendant praised Minor 5: "you did good princess." *Id.*

He then told her, as he would later with Minor 1, "I want you to slide a finger inside your ass" and "u should try it with the dildo." *Id.* at 9-10.

### Minor 6

Between April and September 2023, the defendant communicated with Minor 6, who also talked about being in school. *See generally* Gov. Ex. 6. As with all the other minors whom he was grooming, the defendant called this minor "princess" as well. *Id.* at 14.

### Minor 7: 16-years-old, Pennsylvania

Finally, between July 2023 and September 2023, the defendant enticed Minor 7, who expressly told him that she was 16 years old. *See generally* Gov. Ex. 7; *id.* at 13. Minor 7 lives in Pennsylvania and, in a preview of the defendant's behavior with Minor 1, the two discussed meeting in July when the defendant was in New Jersey. *See* Gov. Ex. 7 at 4-5. Minor 7 was not at home but rather on a high school summer program at a college. *Id.* at 12. The defendant aggressively demanded she sneak out to meet him – as he did with Minors 1 and 2 – although Minor 7 ultimately did not do so. This is a long series of chats in which once again the defendant's aggressively sexual approach clearly made Minor 7 uncomfortable. As he would later with Minor 1, when Minor 7 told the defendant she was a virgin, he replied, "Ill be your only one." *Id.* at 332.

When the defendant came to the east coast for a wedding in September 2023 – the same trip during which he met up with Minor 1 – the defendant also told Minor 7 that he was going to be in the area. *Id.* at 411. The defendant told Minor 7 that they would go on a date and he would come to her place. *Id.* at 413-414. In another carbon copy of his communications with Minor 1, and further evidence of the defendant's willingness to drive long distances to have sex with minors, the defendant told Minor 7 that he would be "in philly" and would "drive to u from

there[.]" *Id.* at 415.  Minor 7 told the defendant this would be a two hour drive, and the defendant confirmed his intent to come anyway.  *Id.* at 416.

## II.     STATUTORY PENALTIES AND GUIDELINES CALCULATIONS

Production of child pornography carries a minimum term of 15 years' imprisonment with a maximum term of 30 years' imprisonment.  *See* 18 U.S.C. § 2251(a) and (e).  Attempted coercion and enticement of a minor to engage in illegal sexual activity carries a minimum term of 10 years' imprisonment with a maximum term of life imprisonment.  *See* 18 U.S.C. § 2422(b). Travel with intent to engage in illicit sexual conduct carries no mandatory minimum, but a maximum term of 30 years' imprisonment.  *See* § 2423(b) and (e).  Transportation of child pornography carries a minimum term of 5 years' imprisonment with a maximum term of 20 years' imprisonment.  *See* 18 U.S.C. § 2252(a)(1) and (b)(1).  Following any term of imprisonment, all four offenses require that the defendant be placed on supervised release for a term of at least five years up to life.  *See* 18 U.S.C. § 3583(k).

**Combined Adjusted Offense Level**

As the Court is aware, although the Sentencing Guidelines are advisory, sentencing court "must consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant.  *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Here, the PSR correctly calculated the offense level and adjustments, other than acceptance of responsibility, as follows:

| Guideline | |
|---|---|
| Base offense level because the defendant was convicted of 18 U.S.C. § 2252(a)(1) and that offense produces the higher offense level (U.S.S.G. § 2G2.1(a)(2)) | 22 |

| | |
|---|---|
| The material involved a prepubescent minor or a minor who had not attained the age of 12 years (U.S.S.G. § 2G2.2(b)(2)) | +2 |
| The offense involved material that portrays sadistic or masochistic conduct (U.S.S.G. § 2G2.2(b)(4)) | +4 |
| The defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor (U.S.S.G. § 2G2.2(b)(5)) | +5 |
| The offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material (U.S.S.G. § 2G2.2(b)(6)) | +2 |
| The offense involved 600 or more images (U.S.S.G. § 2G2.2(b)(7)(D)) | +5 |
| | 40 |
| The defendant is a repeat and dangerous sex offender against minors (U.S.S.G. § 4B1.1(a)) | +5 |
| Total Offense Level | 45 |

The defendant has objected to the two-level increase for use of a computer and the five-level increase for 600 or more images, both of which clearly apply in this case; his objection should be overruled.  First, use of a computer and Internet-based applications like Snapchat and Telegram were integral to the defendant's commission of the offenses to which he has pleaded guilty.  The defendant sought out and victimized minors who were hours away from him in Virginia, in Texas, in South Carolina, and in Pennsylvania.  He would not have been able to do so without use of a computer to locate these minors and groom them using the Internet.  It was by using a computer that the defendant was able to receive the images that he solicited from these girls, and also by using a cellular phone that the defendant was able to record his sexual encounter with Minor 2 for his later sexual enjoyment.  Finally, there is evidence on the defendant's phone that that he used Telegram to obtain the "good videos" folder and its contents.

Telegram is an Internet-based, encrypted instant messaging application.  The defendant would not have been able to obtain these videos without his use of a computer to access this application.

Second, the 600 or more images enhancement also applies.  The application note directs that each video should be considered 75 images.  The "good videos" folder on the defendant's phone contained 64 videos, and he also had a video of Minor 2 and multiple videos of Minor 1.  What is particularly interesting about the defendant's collection is that these cases usually include a combination of images and videos.  The defendant appears to have cultivated a collection exclusively of videos.  Therefore, not only does the 600 or more images enhancement apply to the defendant's collection on its face, it accounts for the defendant's clear preference for longer-form content than a mere image could provide.

<u>**Acceptance of Responsibility Should Not Apply**</u>

The United States objects to the statement that the defendant has clearly demonstrated acceptance of responsibility for the offense and should therefore receive a two-level reduction pursuant to U.S.S.G. § 3E1.1(a).  The defendant bears the burden of proving by a preponderance of the evidence that he accepted responsibility.  *See United States v. Martinez*, 901 F.2d 374, 377 (4th Cir. 1990).  While "a guilty plea may provide some evidence of contrition, it does not, standing alone, entitle a defendant to a reduction as a matter of right."  *United States v. Harris*, 882 F.2d 902, 905 (4th Cir. 1989) (citing *United States v. White*, 875 F.2d 427, 431 (4th Cir. 1989)).  This is because a defendant may plead guilty for reasons other than contrition, for example, after exhausting all legal remedies short of trial and realizing that a plea agreement is his best option when the evidence is overwhelming.  *Id.* at 906; *see also*, *e.g.*, *United States v. Franklin*, 902 F.2d 501, 510 (7th Cir. 1990) (finding no acceptance of responsibility when defendant pleaded guilty two weeks before trial because she "had already exhausted all legal

remedies short of trial – all pre-trial motions were made and ruled on and no legal controversies were pending" such that her only option was a guilty plea to potentially lessen her punishment). As relevant here, the Court should consider whether the defendant has truthfully admitted the conduct comprising the offense of conviction, whether he has truthfully admitted or not falsely denied any relevant conduct for which he is accountable, and the timeliness of his conduct in manifesting acceptance of responsibility.  *See* U.S.S.G. § 3E1.1(a), App. Note 1(A) and (H); *see also United States v. Jones*, 31 F.3d 1304, 1308 (4th Cir. 1994).  These factors weigh against acceptance of responsibility in this case.

First, only after the defendant's motions were denied and it became all too apparent to the defendant that he would be unable to blame everyone else for his own conduct, that he would lose at trial, and that he would receive a worse sentence as a result did he decide it was in his best interests to seek lenience by pleading guilty.  He still waited until one week before trial – after nearly all pretrial deadlines had been met – to advise the Court and the government of his decision, and he entered that change of plea a mere five days before trial.  This timeline does not constitute timely acceptance of responsibility.

Second, the defendant has never been truthful about his conduct with any minor other than Minor 1.  He directed prior counsel to represent to the assigned prosecutor (prior to engaging in any plea negotiations) that his conduct with Minor 1 was the first time he had engaged in such conduct.  These representations are demonstrably false, as even a cursory review of his communications with Minors 2-7 and his previously video-recorded sexual encounter with Minor 2 make clear.  Moreover, the defendant has refused to admit his conduct with Minor 2, which is intrinsic to the charge in Count 4 as the sexually explicit video the defendant recorded while having sex with her was on the phone that he transported into the Eastern District of

17

Virginia on September 25, 2023.[5]  This conduct is further intrinsic to the charged offenses because his communications with Minor 2 establish that she was a minor at the time, the defendant knew she was a minor, and he knew that the video he transported on his phone depicting her contained sexually explicit conduct.  Nonetheless, the defendant expressly told law enforcement that he had never before met up with someone under the age of 18 for sex, *see* Gov. Ex. 8, and he did not admit this conduct in his statement of facts supporting his guilty plea.

Third, at the hearing to continue trial held in December 2023, newly retained defense counsel expressly told the Court that the defendant wanted certain motions filed.  The motions that followed included a motion to suppress the anticipatory search warrant in which the defendant alleged with zero factual basis that the affiant had committed perjury.  ███████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ . ███████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████

The defendant claims that he merely exercised his right to challenge constitutional issues and not those that relate to factual guilt.  Not so.  In his motion to admit evidence under Rule

---

[5] The statement that the video of Minor 2 was one of the 64 videos that the defendant admitted in his Statement of Facts to transporting into the Eastern District of Virginia, PSR at 31, is inaccurate.  He admitted to only the 64 videos contained in the "good videos" folder, which did not include his videos of Minor 1 or Minor 2.

412, the defendant argued that such evidence was ███████████████████████████████

██████████████████████████████████████" Dkt. No. 41 at 1; *see*

*also* Reply at Dkt. No. 57, at 1 ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████. This motion was on its face a challenge to the defendant's factual guilt and a blatant

attempt to shift the blame for the defendant's conduct onto a vulnerable minor, just one more in a

long line of minors whom the defendant had exploited in similar ways.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████, the defendant clearly understood in the moment that his

actions were illegal. *See, e.g.,* Gov. Ex. 2 at 15-17 (discussing defendant's lies about his age and

concern about Minor 2's sister knowing that they had had sex). These statements are another

transparent attempt to shift blame and decline to accept responsibility for his actions.

In conclusion, the defendant's words and actions in this case – towards law enforcement,

the assigned prosecutor, the Court, ██████████████████ – evince a refusal to truthfully

admit all of his conduct while attempting to shift the blame to anyone but himself. His last

minute, calculated change of plea was an attempt to gain lenience, not evidence of true

contrition. The defendant did not accept responsibility here, he accepted inevitability, and his

guidelines calculation should reflect that reality.

### III.   SECTION 3553(a) FACTORS

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  As explained below, consideration of these factors suggests that a 35-year sentence is appropriate in this case.

### The History and Characteristics of the Defendant

Although the defendant has never been caught before, he has been abusing girls, and soliciting and collecting their sexually explicit material for at least the past two years.  As the iMessage chats attached to this filing prove, the defendant has been practicing, honing, and perfecting his techniques for coercion and enticement.  He lies about his age to appear more age appropriate; he refuses to be put off when girls appear uncomfortable with his overtly sexual overtures; and he targets girls who have difficult backgrounds, family situations, or mental health issues and exploits those vulnerabilities to his own advantage.  He tells them he loves them, he calls them his "princess," he assures them that they are in a committed relationship and that they can trust him as perhaps they have been able to trust no one else in their lives before.

This grooming behavior then transitions into requests from the defendant for pre-existing sexually explicit material and then explicit requests by the defendant for new material with exactly the kind of content that the defendant finds most sexually stimulating.  Finally, the

20

defendant starts talking about a meeting; he is willing to travel for hours in order to have sex with these girls.  In the case of Minor 2, in 2021, the defendant successfully lured a 15-year-old girl into three sexual encounters, one of which he filmed for his own viewing and sexual stimulation at later dates.  In this case, with Minor 1, the defendant came within a few days of being able to recreate that experience.  But for the vigilance of Minor 1's guardian, he might have had sex with another 15-year-old girl.  And during the same trip to the east coast, the defendant would have sought out 16-year-old Victim 7 in Scranton, Pennsylvania for a sexual encounter but for her decision to take steps to protect herself and put him off.

The defendant has been and remains a threat to every teenage girl to whom he can get access, over the Internet or in real life.  He has attempted to minimize his behavior, claiming that he was "lonely and seeking attention in all the wrong ways."   The fact is the defendant is sexually attracted to children.  Only someone with a sexual attraction to children has on their phone a folder titled "good videos" containing videos of 4- to 6-year-old children sobbing while being raped by grown men.  The presence of these videos on the defendant's phone belies any statement he could make that sexual gratification was not his primary goal in the actions he took towards Minor 1 and every other girl with whom he was communicating.

**Nature, Circumstances, and Seriousness of the Defendant's Offense**

The conduct to which the defendant has pleaded guilty in this case is the culmination of an at least two-year spree in which the defendant in various ways victimized at least seven girls over the internet.  ██████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

21

███████████████████████████████████████████

█████████████████████████████████████

And victimize her the defendant did.  The defendant found Minor 1 in a dark place, and he took full advantage.  He groomed her – calling her "princess," giving her money for things like a piercing, and giving her the false impression that their relationship was anything more than predatory.  In addition to collecting her previously created sexually explicit images, he solicited and induced her to create new material depicting his specific sexual turn-ons.  His demands left nothing to doubt, or to the imagination: "Or you can make a video for a few mins where you give the sloppiest head ever while gagging on it[;]" "I want you to slide it deep inside your ass while your fingers go inside your pussy[;]" "Yes. The harder and sloppier the better[;]" "Do a good job and you will [be paid] princess."  Gov. Ex. 1A at 5.

Nor was the defendant satisfied limiting his conduct to the Internet. When Minor 1 told the defendant that she was a virgin, he was thrilled -- "That's good[,]" "I can change that[,]" "I will[,]" and "I wanna be your first[.]"  Gov. Ex. 1A at 2.  The defendant made plans with Minor 1 and drove five and a half hours for the sole purpose of having sex with her.  He booked a hotel room for two people five miles away and he brought prescription pills from a company which advertises "Stronger and Longer Lasting Erections" using the motto "Have Better Sex."  He told the FBI OCE that Minor 1 did not have to worry about getting pregnant because "I wont finish inside u."  Gov. Ex. 1B at 19.  He was single-minded in his purpose.  And yet, some part of the defendant still understood that Minor 1 was a child when he brought a doughnut as a "surprise" for her, an act of continued grooming and enticement before he took her virginity.

The defendant's trafficking of child sexual abuse material is also extremely serious. As an initial matter, he did not merely transport videos of Minor 2; he instead met her online,

groomed her, lied to her, exploited her, met her in person to have sex, filmed that sexual conduct, sent it to her, and then ultimately transported it with him as he traveled around the country. Moreover, the defendant did not merely transport the videos in the "good videos" folder on his phone, but in fact downloaded them from Telegram, feeding demand for this abusive content and ensuring that they continued to circulate broadly on the internet.

More generally, Minors 1 and 2 and all of the children depicted in the "good videos" materials will suffer consequences for the rest of their lives. "Long-term studies" confirm that "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways in which no just or human society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). "When child pornography is produced in conjunction with the sexual abuse of children, . . . the harm to the child victims is magnified and perpetuated." *Id.* at 1208. The Fourth Circuit has long held that "child pornography crimes are grave offenses warranting significant sentences." *United States v. Johnson*, 242 F. App'x 7, 11 (4th Cir. 2007).

The defendant's trafficking of the videos and images of sexual abuse both perpetuate and exacerbate the trauma of the abuse. "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters").As courts have regularly recognized, "[s]uch images are 'a permanent record of the children's

participation and the harm to the child is exacerbated by their circulation.'"  *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *New York v. Ferber*, 458 U.S. 747, 759 (1982)); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.").  These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

The victims' statements confirm the deep and long-lasting effects of the defendant's actions.  For these victims, the trauma and pain endure long after the direct physical abuse itself stops.  They continue to suffer devastating consequences from the knowledge that offenders like the defendant consistently view images and videos that depict their sexual abuse.  The irreparable harm that the defendant has caused to the victims of his offenses warrants a substantial term of incarceration.

**<u>Promote Respect for the Law and Afford Adequate Deterrence</u>**

A significant sentence is absolutely necessary in this case to deter the defendant and others from engaging in this conduct in the future.  Incapacitation – preventing the defendant from reoffending <u>at all</u> – should be a primary objective of the Court's sentence.  The defendant's dangerousness is evident from his pattern of grooming and exploiting girls. Moreover, simply getting caught clearly has not deterred him, as he has continually lied about his conduct, attempted to shift the blame to the victims, failed to acknowledge the harm he has caused his victims, and failed to accept responsibility and acknowledge the seriousness of his behavior.

The defendant's characteristics, long-standing sexual interest in children, and disregard for their wellbeing and the law all indicate that he has a high chance of recidivism and hands-on offending in the future.

Moreover, a strong sentence here is critical to address "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003). And even if a defendant *could* be described as a "low risk" to recidivate, "[a] low risk is not the same as no risk." *Irey*, 612 F.3d at 1216-17. "Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *Id.* at 1217; *cf. United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) ("The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose.").[6] Here, both factors clearly point towards a lengthy period of incapacitation. The defendant and those who think like him need to understand that they risk lengthy prison sentences for this conduct and, perhaps, decide the risk is too much. The sentence in this case must constitute a loud and clear warning that severe consequences will result from such acts.

Indeed, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child

---

[6] "Nor does the fact that [the defendant] will be subject to restrictions and supervised release [if] he gets out of prison offer any guarantee that he will not commit any crimes." *See Irey*, 612 F.3d at 1215 (discussing studies and other data showing that "supervised release . . . often fails to prevent sex offender recidivism"). In short, "[s]upervised release is better than unsupervised release, but it does not offer society the level of protection from a convicted criminal that incarceration does." *Id.* at 1216.

pornography market.'"  *Id.* (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721-22 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").  Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years. *See, e.g.*, U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf. That depravity is evident in this case. The need for effective deterrence through a severe sentence here is therefore essential. The government's recommendation of thirty-five years accomplishes this goal.

The government's sentencing recommendation is for 30 years' imprisonment on Count One, to run concurrent with the 10-year mandatory minimum for Count Two and the sentence the Court imposes on Count Three.  Because Counts One through Three encapsulate the defendant's victimization of Minor 1, it is appropriate that those counts run concurrently. However, the Court should impose the five-year mandatory minimum sentence for Count Four to run consecutive because the defendant's transportation of child pornography overwhelmingly harmed a separate set of victims -- Minor 2 and the series victims whose videos were found in the "good videos" folders.  The harm to them should be captured separately from the sentence reflecting the harm to Minor 1.

## IV.    SUPERVISED RELEASE

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*,

511 U.S. 39, 50 (1994).  Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000).   Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life.  This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time.  *See, e.g.*, Lifetime Consequences for Sex Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison").  Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, *see* U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted).

Here, in a short period of time the defendant has proven himself dangerous to every girl he meets, whether online or in real life.  He has an obvious, demonstrated sexual interest in children that he is motivated to gratify at all costs.  Therefore, the United States believes that it is appropriate to impose a lifetime term of supervised release with the conditions of supervision contemplated under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(d)(7) for sex offenders required to register under the Sex Offender Registration and Notification Act.

V.     **SPECIAL ASSESSMENTS UNDER THE JVTA & AVAA**

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of

$5,000 on any non-indigent defendant convicted of, among other offenses, distribution of child

pornography.[7]  *See* 18 U.S.C. § 3014.  While the statute is silent as to how to determine

indigence, courts have treated the imposition of this assessment like the imposition of other

post-conviction assessments, where "[t]he defendant bears the burden of proving both his

inability to pay at the time of sentencing and that he is not likely to become able to pay a fine

upon his release from his term of imprisonment."  *United States v. Kelley*, 861 F.3d 790, 801 (8th

Cir. 2017) (internal citations and quotation marks omitted).  Relevant factors to consider in this

determination include a defendant's future earning potential, assets, educational background,

employment history, age, and physical condition.  *See United States v. McMiller*, 954 F.3d 670,

675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a

defendant's future earning potential when determining his ability to pay an assessment under 18

U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650

(4th Cir. 2019).

Here, the PSR details the defendant's educational background and financial condition.

He is well-educated and he was gainfully employed for $95,000 per year as a business analyst

for an information technology company.  *See* PSR at ¶ 96.  He has significant earning potential.

*See id.*  He should be able to generate enough income in his lifetime to pay a $20,000 special

assessment.  *See* 18 U.S.C. § 3613 (noting that the liability to pay a fine or restitution shall

---

[7] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund,
which awards grants and enhances programming for victims of human trafficking and child
pornography.  The § 3014(a) assessment is payable after the defendant has satisfied all
outstanding court-ordered fines, orders of restitution, and any other obligation related to victim
compensation.  *See* 18 U.S.C. § 3014(b) & (e).

terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later); *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018).   Accordingly, the United States respectfully requests that the Court find the defendant non-indigent and impose the mandatory $20,000 special assessment under 18 U.S.C. § 3014.

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA). The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess not more than $50,000 on any person convicted of a child pornography production offense." 18 U.S.C. § 2259A(a)(3).  Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d), 2259B, and shall be paid in full after any special assessment under 18 U.S.C. § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2).  In determining the amount to be assessed under 18 U.S.C. § 2259A, courts should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and the guidance in 18 U.S.C. § 3572 for the imposition of fines. *See* 18 U.S.C. § 2259A(c).  The United States respectfully requests that the Court impose a reasonable special assessment under 18 U.S.C. § 2259A, in addition to the $400 mandatory special assessments for his felony convictions pursuant to 18 U.S.C. § 3013.

## VI.    RESTITUTION

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the full amount of the victims' losses as those losses are defined by Section 2259(c)(2).  *See also Paroline v. United States*, 572 U.S. 434, 458 (2014) ("[A] court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that

underlies the victim's general losses.").  The Court must enter restitution in an amount not less than $3,000 per victim.

Minor 1's guardian has submitted a restitution request.  This request includes $1,187.33 for security and investigation-related expenses and $3690 for therapy for Minor 1 to date.  He has also represented that the cost of therapy is $180/week and Minor 1 is expected to attend therapy for the foreseeable future.  The government therefore requests restitution of $45,000 for future therapy costs, representing 50 therapy sessions a year for five years. The total restitution request for Minor 1 therefore totals $49,877.33.

Minor 2 has also submitted a restitution request.  This request includes $180 for therapy t date.  She represents that the cost of therapy is $30/session and she does not know how long she will be going.  The government therefore requests restitution of $7500 for future therapy costs, representing 50 therapy sessions a year for five years.  The total restitution request for Minor 2 therefore totals $7,680.

Two so-called "series" victims from the defendant's "good videos" collection have also submitted restitution requests totaling $15,000.  The bases for those requests is included in the attachments to the PSR, and the United States asks that the Court grant those victims' requests.

## VII.   FORFEITURE

The parties previously filed a consent order of forfeiture, and the United States asks that the Court enter the final such order at sentencing.

## **CONCLUSION**

For the reasons stated above, the United States respectfully requests that the Court impose a term of 35 years' imprisonment, a lifetime of supervised release, a $400 special assessment pursuant to 18 U.S.C. § 3013, a $20,000 special assessment pursuant to 18 U.S.C. § 3014, a reasonable special assessment under 18 U.S.C. § 2259A, and restitution in the amount of $72,557.33.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____
Laura D. Withers
Zoe Bedell
Assistant United States Attorneys