**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ELISHA JASON ALBERT,<br>*Defendant*. | Case No. 1:23-CR-172<br><br>Hon. Michael S. Nachmanoff<br><br>Sentencing: May 16, 2024, at 10:00 am |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS
<u>OBJECTIONS TO THE PSR & POSITION WITH RESPECT TO SENTENCING</u>**

Elisha Jason Albert, by and through counsel, respectfully submits his objections to the Presentence Report along with his Position with Respect to Sentencing.

For the reasons stated herein, Mr. Albert submits that the Guidelines range in this case far exceeds the level of punishment that is "sufficient, but not greater than necessary" to achieve the objectives of 18 U.S.C. §3553(a) and that the mandatory prison term of fifteen years (180 months) with a period of supervised release is more than sufficient to serve the objective of §3553(a) in this case.

<u>DISCUSSION</u>

Mr. Albert recognizes the profound wrong he committed during the instant case and the responsibility he bears for any harm he has caused. To that end, Mr. Albert accepted responsibility for his conduct without any promise or inducement from the government when he pleaded guilty to the Indictment a *mere four months* after he was arrested. The issue presented here for the Court to decide in sentencing Mr. Albert is what sentence is sufficient but not greater than necessary to meet the statutory goals of sentencing. Unfortunately, the Court's sentencing discretion is limited by the statutorily mandated minimum sentences required for count one

1

(fifteen years), count two (ten years), and count four (five years).  However, this Court can and should order these mandatory sentences to run concurrently with one another.  *See* 18 U.S.C §3584; U.S.S.G §5G1.2(c) ("[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.").

Accordingly, given (1) Mr. Albert's early acceptance of responsibility, (2) his lack of criminal history, (3) his personal history and circumstances, (4) sentences imposed on other CSAM defendants for the same or worse harm created by their actions, and (5) the fact that he will spend the remainder of his life—a young man in his twenties—branded "a child sexual predator;" the mandatory prison term of fifteen years—180 months—with a period of supervised release is sufficient (if not already greater than necessary) to meet the goals of sentencing.

## I.      Statement Of The Case

The facts of this case are known all too well to this Court and need not be fully restated here.  Moreover, the government will surely restate them again as it has in every pleading.  Mr. Albert would simply like this Court to know that he becomes more ashamed after every reading of the Government's pleadings.  That feeling doesn't dissipate.  Yet, Mr. Albert is determined to face his actions and be accountable.  He looks forward to his sentencing hearing so he perhaps can make this Court understand that feeling, and so he can begin to make amends to the victims for his actions.  It would be an understatement to state that Mr. Albert is extremely remorseful for what he did.  The government will dismiss that remorse and simply chalk it up to "that's what people say when they are caught."  But Mr. Albert regrets all of his actions, including those beyond the specific limits of this case.  He has spent considerable time trying to gain insight into and understand what motivated his terrible decisions.

It is important to note that Mr. Albert is a very young man, just twenty-five years old. It's extremely likely that the prefrontal cortex of his brain, which governs functions like reasoning, judgment, and impulse control, are just becoming fully developed.  Mr. Albert, likely similar to the minor victims in this case, has some type of sexual trauma in his background.  That trauma, coupled with drugs, rejection, a pandemic, isolation, instability, and other factors, likely contributed to Mr. Albert's poor decision-making and his motivation to seek out younger, post-pubescent teenagers.  However, in trying to understand his own behavior, Mr. Albert has gained a deeper understanding of why the minor victims were so vulnerable and why his actions took advantage of that vulnerability.  That is why his feelings of shame continue to grow.  He hopes that his sentencing hearing will provide them with some type of closure.

## II.    Objections and Corrections To The Presentence Report ("PSR")

Since *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has required district courts to consider *both* the United States Sentencing Guideline ("U.S.S.G") range and the sentencing factors set out in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence.  As such, sentencing courts are instructed to first correctly calculate the Guideline range for a given defendant, then consider the § 3553(a) factors to determine whether a sentence within the Guideline range is appropriate or whether a departure or variance from the Guidelines is warranted.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Before a sentencing Court can apply any given sentencing enhancement under the Guidelines, the Court must first find, under a preponderance standard, that evidence supports

such an enhancement. *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009) ("[p]reponderance of the evidence is the appropriate standard of proof for sentencing purposes"); *United States v. Noe*, 191 Fed. Appx. 216 (4th Cir. 2006) (district court's use of preponderance of evidence standard in making factual findings supporting sentencing enhancements was constitutional). Moreover, in determining whether a given Guideline provision applies to a specific case, a sentencing court must first examine the guideline's plain text. *See United States v. Campbell*, 22 F.4th 438, 444 (4th Cir. 2022) ("[i]t is the guideline's text, of course, that takes precedence, and so that is where we begin. And in doing so, if possible, we will give a guideline's text 'its plain meaning'") (internal citations omitted).

Here, the majority of Mr. Albert's objections and corrections to the guidelines/PSR have been addressed favorably by the PSR writer. *See* Dkt. 91 (Final PSR). However, Mr. Albert continues to object to the inclusion of the conduct surrounding Minor Victim 2 as "relevant conduct" for Guidelines calculation purposes and the government's attempt to remove Mr. Albert's Acceptance of Responsibility adjustment under Guideline §3E1.1(a).

### a. *The conduct surrounding other minors is not "relevant conduct" for guidelines purposes.*

Mr. Albert objects to the inclusion of PSR ¶¶31-40 (factual background of Minor Victim 2) in so far as their inclusion is used as a basis to increase the relevant offense level. Additionally, Mr. Albert agrees with the PSR writer and objects to the government's requested addition of chats with individuals other than Minor Victim 1 to the PSR, or these chats being considered in any way for sentencing. *See* Dkts. 95, pp. 11-14 (Govt Position on Sentencing); 95-4 (Govt Exhibit); 95-5 (Govt Exhibit); 95-6 (Govt Exhibit); 95-7 (Govt Exhibit).

For guidelines purposes, there are two class types of pertinent conduct that are used to determine the applicable offense level for any specific guideline. One type of conduct, "relevant

conduct," laid out at U.S.S.G §1B1.3(a)(1), only looks at the conduct surrounding the offense of conviction; the second classification of conduct is often referred to as "expanded relevant conduct" which can look to conduct that is not directly related to the offense of conviction. The Guidelines direct, through the cross-reference in §1B1.3(a)(2) to §3D1.2(d), which of the Chapter Two Guidelines may use the expanded relevant conduct inquiry. As relevant here, §2G2.2 uses "expanded relevant conduct" to derive its guidelines calculus, whereas §2G2.1 uses the narrower "relevant conduct" inquiry.

Though "expanded relevant conduct" is broader than mere relevant conduct, it is not limitless; specifically, the expanded definition looks at "acts … that were part of the [1] *same course of conduct* or [2] *common scheme or plan* as the offense of conviction." §1B1.3(a)(2) (emphasis added). Though these two terms are similar, they have distinct meanings: (1) common scheme or plan means "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi[,]" §1B1.3 comment. (n.5(B)(i)), whereas (2) same course of conduct means "[the offenses] are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses…[considering such factors as] degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required." *Id.*, at (n.5(B)(ii)).

As identified by the PSR writer, §2G2.1 is the guideline used for counts one through three. Regarding the fourth count, the guidelines state that §2G2.2 applies for a violation of 18 U.S.C. § 2252(a)(1) unless the offense involves the production of child pornography. In such

5

cases, you must either apply §2G2.2 or §2G2.1—whichever guidelines result in the greater offense level.  *See* U.S.S.G. §2G2.2(c).  Here, the PSR writer correctly determined that as to count four, guideline 2G2.2 applied due to the fact that it resulted in a higher offense level.  *See* PSR, pg.14, ¶53.  Additionally, as the PSR writer correctly notes, given that this guideline results in the highest offense level, pursuant to U.S.S.G. §3D1.3(a), it is also the offense level applicable to the grouped offenses of counts one through four.

However, the conduct surrounding Minor Victim 2, to the extent that it is used to justify the enhancement at §2G2.2(b)(5) ("pattern of activity"), is simply too remote and attenuated to be considered relevant conduct in this case.  *See e.g.*, *United States v. Amerson*, 886 F.3d 568, 575 (6th Cir. 2018) (previous handgun possession not relevant conduct in the instant felon-in-possession offense even though offenses were three months apart, because "with only some evidence of temporal proximity and no showing of regularity, the government had to show stronger evidence of similarity."); *United States v. Bowens*, 938 F.3d 790, 792 (6th Cir. 2019) (firearm under pillow not relevant conduct when the offense lacked regularity and similarity and had weak temporal proximity to the instant offense of conviction).

While it is true that count four necessarily includes the images/videos of Minor Victim 2, as they were located on the phone that Mr. Albert transported across state lines, this fact alone does not warrant a crawling and endless examination—for guidelines purposes—of the conduct underlying the creation of each video that was located on Mr. Albert's phone.  If such an all-encompassing inquiry were permitted, Mr. Albert's guidelines on a transportation charge would be artificially increased by the conduct of others for videos that he took no part in creating and merely possessed.  The conduct surrounding Minor Victim 2, which occurred nearly two years

6

prior in a different state with an entirely different individual, cannot be wedged into Mr. Albert's current guidelines.

Regarding Minor's 3 through 7, the government has attached hundreds upon hundreds of pages of chats to its Position on Sentencing. *See* Dkt. 95-4; 95-5; 95-6; 95-7. However, the government has provided *no proof* to the Court that these individuals to whom Mr. Albert was chatting were, in fact, minors. There is not a single law enforcement interview with any of these individuals or, in fact, a single scrap of discovery evidencing who they really are. Indeed, as the government readily admits, three of the purported minors never stated their supposed age. Moreover, for all the hundreds of chats that the government asks that this Court consider, it has not produced a single CSAM video/image from these ostensible minors; and this is for a simple reason, the videos/images do not exist—not a single bit of contraband was discovered on Mr. Albert's phone in relation to these minors despite the exhaustive computer forensic examination that the government performed on the phone following Mr. Albert's arrest. However, what is readily apparent from the government's prominent use of these chats, is its attempt to shoehorn unproven "bad" conduct into the instant sentencing so as to inflame the passions of the Court in its determination of a proper sentence for Mr. Albert.

Though it is assuredly true that the government is still investigating these alleged minors, and might someday have evidence regarding their identity, the injection of these minors into the sentencing calculus—in the twilight phases of the instant prosecution—also offends the general notion of fairness in the sentencing process. As made clear in the indictment to which Mr. Albert pled, counts one through three seek to punish Mr. Albert for his conduct relating to Minor Victim 1 in August and September of 2023, and count four seeks to punish Mr. Albert for transporting CSAM, again in September of 2023. Consideration of such material as that which the

government now puts upon the Court is inherently unfair.  Should the government seek to prosecute Mr. Albert for offenses allegedly committed by him against any of these purported minors, it will surely bring successive prosecutions and seek to punish him accordingly. However seeking to front load that punishment now, in the instant prosecution concerning Minor Victim 1, with no protection from future punishment for the same conduct offends the spirit if not the goals of 18 U.S.C. 3553(a) and the protections of the Fifth Amendment's Double-Jeopardy clause: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. X.

Moreover, while it is true that a sentencing court is given a wide berth in the terms of information that it can consider when determining a sentence, "[t]here is a constitutional limit, however. The Due Process Clause of the Fifth Amendment requires that information used for sentencing be accurate. The judge may consider information only if it has "sufficient indicia of reliability to support its probable accuracy." *United States v. Guajardo-Martinez*, 635 F.3d 1056, 1059 (7th Cir. 2011) (citing *United States v. Tucker,* 404 U.S. 443, 447, 592 (1972)).  In considering these chats, the PSR writer was correct in stating that "[t]he probation office has reviewed the chats and does not believe it is necessary to include a summary of them in this [PSR]."  PSR Addendum, Dkt. 91, pg. 30.  Indeed, basing Mr. Albert's sentence in any way, no less a guidelines enhancement, on these chat messages—which do not actually have any CSAM within them and whose ages and identities have not been fully verified—would be wholly improper.  *See also United States v. Grubbs*, 585 F.3d 793, 801-802 (4th Cir. 2009) ("Accordingly, sentencing judges are free to find facts *by a preponderance of the evidence*, provided that the sentence actually imposed is within the statutory range, and is reasonable…Sentencing courts continue to exercise their long-standing authority to hear the

evidence, and consider any evidence at sentencing *that has sufficient indicia of reliability*.") (emphasis added).  As such, Mr. Albert not only objects to the inclusion of Minors 3 through 7 for Guidelines purposes but also objects to any consideration paid to these chats for his overall sentence determination under 18 U.S.C. §3553(a).

Though MV-2 is arguably relevant to the government's 18 U.S.C. §3553(a) argument, Mr. Albert's guidelines calculation for the instant 2023 conduct should not be artificially increased by employing an overly expanded relevant conduct inquiry that seeks to penalize behavior that occurred states away, years apart, and involved entirely different victims.

### b. *Mr. Albert clearly is deserving of an Acceptance of Responsibility Adjustment.*

The PSR writer correctly gave Mr. Albert the Acceptance of Responsibility adjustment under U.S.S.G §3E1.1(a), PSR, ¶¶51, 64, and the government's attempt to remove this adjustment is wholly unwarranted.  The government seeks to remove Mr. Albert's Acceptance of Responsibility for three primary reasons: (1) he initially lied to law enforcement during his interview immediately following his arrest, (2) he refused to include facts related to Minor Victim 2 in the Statement of Facts filed in this case, and (3) he plead guilty in this case five days before trial.  Simply put, none of these proffered reasons justify the removal of the §3E1.1(a) adjustment here.

First, the timing of Mr. Albert's plea clearly favors granting him the §3E1.1(a) adjustment.  Mr. Albert was arrested on September 25, 2023, and denied a bond—which he never appealed.  Following a hearing on his motions, Mr. Albert pleaded guilty to every charge in the indictment, without the benefit of a plea agreement, *only four months* after his initial arrest.  Moreover, Mr. Albert's quick acceptance of responsibility in this matter, again without any inducements from the government by way of a plea agreement, also counterbalances any

effect that his initial untruths with law enforcement had during his post-arrest interview immediately following his capture.  *See* U.S.S.G. §3E1.1, comment. (n.3) ("[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction…will constitute significant evidence of acceptance of responsibility[.]").  Indeed, it is hard to fathom how Mr. Albert could have moved any quicker in his acceptance of responsibility in this case, absent throwing himself at the government's feet immediately upon arrest—a standard that has never been required for a §3E1.1(a) adjustment.

Moreover, though the government cites the fact that Mr. Albert pleaded "after most pre-trial deadlines had passed, including those for pre-trial briefing and exhibits[,]"§3E1.1 makes clear that this is not a valid reason to deny Mr. Albert the Acceptance of Responsibility adjustment:

> …a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. *This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt* (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

U.S.S.G §3E1.1, comment. (n.2) (emphasis added).

Here, Mr. Albert did not go so far as to exercise his right to a trial (as contemplated in the factual pattern posed by the commission above), but he did file motions to suppress challenging the constitutionality of government actions concerning his arrest—i.e. "*issues that do not relate to factual guilt.*"  Given that Mr. Albert did not take this case to trial (which the Commission still does not view as preclusive of acceptance) and challenged, pre-trial, certain constitutional issues unrelated to factual guilt, he is not precluded from receiving the §3E1.1(a) adjustment.

The government badly asserts that some of Mr. Albert's motions were an "attempt to humiliate the minor victim, penalize her cooperation with law enforcement, and dissuade the

government from relying on her testimony and evidence, in direct contravention of Rule 412[,]" however this naked assertion is meritless and based on pure speculation—not to mention untrue. Plainly, in Mr. Albert's Fed. R. Evid. 412 motion, Dkt. 41, he did not contest the factual underpinnings of his behavior but instead sought to establish that the government might not be able to prove that his actions, in fact, caused the production of CSAM in this case—an argument that he was constitutionally able to pursue.  *See United States v. Broxmeyer*, 616 F.3d 120, 125 (2d Cir. 2010) (As used in § 18 U.S.C. § 2251(a) "'Persuade,' 'induce,' and 'entice' are in effect synonyms...These are words of causation; the statute punishes the cause when it brings about the effect.  Sequence is therefore critical.  The facts of this case require us to belabor the obvious: [defendant] could only persuade, induce, or entice [Minor] to take Photos 1 and 2 if his persuasion, inducement, or enticement came *before* she took them."); *United States v. Saunders*, 736 F. Supp. 698, 703 (E.D. Va. 1990), *aff'd*, 943 F.2d 388 (4th Cir. 1991) ("Although the Rule [412] provides no guidance as to the meaning of the phrase "constitutionally required," it seems clear that the Constitution requires that a criminal defendant be given the opportunity to present evidence that is relevant, material and favorable to his defense.").  Though the Court ultimately disagreed with Mr. Albert's motion, this disagreement is not grounds for the government's naked assertions regarding his supposed motivation for filing the motion, nor is it somehow evidence that Mr. Albert has not accepted responsibility for his conduct.

Additionally, the government's rationale regarding Mr. Albert's plea timing seems to conflate an adjustment under §3E1.1(a)—which is a two-level adjustment—with the single-level adjustment under §3E1.1(b), which is only given upon the government's motion.  Under subsection (b), the government reserves the right to file a motion asserting that the defendant's acceptance of responsibility has "assisted authorities in the investigation or prosecution of his

own misconduct by timely notifying authorities of his intention to enter a plea of guilty, *thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently*, decrease the offense level by 1 additional level." §3E1.1(b) (emphasis added).  The government's remedy for what it apparently complains of— spending time preparing for trial and motions—is fully addressed by the fact that it will not seek to give Mr. Albert an adjustment under subsection (b), which is its right.  However, simply because the government decided, using its discretion under subsection (b), not to file for an additional adjustment does not mean that Albert is still not entitled to an adjustment under subsection (a) because he did, in fact, accept responsibility for his conduct.

As previously stated, Mr. Albert accepted responsibility for his conduct mere months after his initial arrest.  More to the point, however, Mr. Albert has submitted a detailed statement both to the Court and the PSR writer clearly evidencing his acceptance of responsibility:

> For the past couple of months, I've had a lot of time to think and reflect on what I want to say to the Court, the government, and anyone who was hurt by my conduct. First and foremost, I would like to apologize to anyone I've hurt—especially the minor whom I was coming to meet.  I would also like to apologize to this Court and the government for having to spend time and resources on my bad conduct.  Finally, I want to apologize to my family for all that they have had to endure and for what they will have to endure into the future… I come before you today filled with tremendous guilt and shame regarding what has happened.  I realize now how wrong it is to meet with someone underage just to fulfill my own desires… Sitting here now, in the daylight, I realize that not only have I broken the law, but more importantly, have created lasting emotional harm to someone and their family.  For that, I will eternally be sorry, having to bear this on my conscience for the remainder of my days… The truth is that I did possess explicit material of this victim, I did attempt to meet her for the purpose of a sexual encounter, and I did have horrible material on my phone.  For the past 8 months, I've had time to think about how horrible my actions were, and I don't think I could apologize enough to the victims and their families… it makes me sick to my stomach knowing the harm that I have caused and that we are all here today because of my conduct, not only with this minor but also regarding the material that was on my phone.

**Exhibit 1**, pg. 1 (Albert's Letter to the Court).

Finally, the government seeks to deny Mr. Albert his Acceptance of Responsibility adjustment because "he refused to admit…any facts about the Texas victim[.]" First and foremost, this was a legal decision made by counsel in this matter, not Mr. Albert.  The reason being, as argued at length above, is that these facts were simply not "relevant conduct," even under the expanded definition for §2G2.2 purposes.  More to the point, the guidelines specifically permit a defendant to argue about "relevant conduct" without losing the ability to obtain a §3E1.1(a) adjustment:

> Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). *A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection*. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, *but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous*[.]

U.S.S.G §3E1.1, comment. (n.1(A)) (emphasis added).

Given that Mr. Albert expeditiously, and without any promises from the government, accepted unconditional responsibility for his conduct in the instant matter and saved Minor Victim 1 from the emotional trauma of having to suffer through a trial, Mr. Albert rightfully was awarded the §3E1.1(a) adjustment.

## III.    A Sufficient Sentence Under 18 U.S.C. § 3553(a)

Indeed, by enacting 18 U.S.C. § 3553, Congress has *directed* that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in the statute.[1]  The Supreme Court has held that

---

[1] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need

sentencing courts are required to "consider what sentence is appropriate for *the individual defendant* in light of the [§ 3553(a)] sentencing factors," *Nelson v. United States*, 555 U.S. 350, 351 (2009) (emphasis added), to ensure that the punishment imposed in a particular case "fit[s] the offender and not merely the crime[,]" *Williams v. New York*, 337 U.S. 241, 247 (1949).  In determining the particular sentence for a given defendant, the Supreme Court has also stated that the Sentencing Guidelines cannot be used as a substitute for a court's independent determination of a just sentence.  *See Spears v. United States*, 555 U.S. 261 (2009).

### a.  *Mr. Albert's Personal Background and History.*

As is often the case in these types of offenses, Mr. Albert's biographical background sheds a great deal of light on why he is presently before the court awaiting sentencing.  It is important to note that Mr. Albert does not offer the following to justify or excuse his criminal culpability in this case, which he could never do, but merely to provide the necessary context for his actions.

Mr. Albert, a young man barely out of his early twenties, was born to married parents in Karachi, Pakistan, as the youngest of three siblings.  As stated in the PSR, Mr. Albert spent most of his childhood growing up in Pakistan.  His family was part of a very small minority Christian community and, at times, faced significant discrimination because of this fact.  Indeed, in 2012, due primarily to the discrimination that the family was suffering and deteriorating conditions in Pakistan, Mr. Albert's family immigrated to the United States—becoming naturalized citizens in 2015.  *See* PSR, ¶79 ("[Mr. Albert] reported witnessing violence in the area where he grew up.

---

for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

As his family was the only Christian family in the area, they faced a great deal of pressure from their community due to their faith.  The defendant recalled Christian churches being attacked and people being shot and killed due to their religion.").

In his formative years, Mr. Albert enjoyed a loving but very strict relationship with his parents.  A product of their environment, Mr. Albert's family was not one in which "problems" or emotional hardships were discussed.  In their local community, mental health issues were considered a taboo subject, and as such, people (including young children) were expected to buck up and bear through any "issues" they might have been experiencing.  As it can be imagined, growing up in this cloistered environment greatly impacted Mr. Albert.  He was conditioned from a very early age to "deal" with personal problems in a quiet way—seeking outside help was considered weak and unacceptable—all leading to his abuse of controlled substances, discussed further below.

Equally harmful, and especially relevant here, was the way in which his community shaped his view of relationships, acceptable norms for dating and seeking partnership, and sexual and emotional affection.  Indeed, this fact is borne out by a report on Pakistani marriage published in the National Library of Medicine:

> Pakistan is the world's fifth most populous country with a population of more than 212.2 million. The female legal age at first marriage in Pakistan was, until 2019, 16 years. In April 2019, the Senate of Pakistan passed a bill stipulating that legal age of first marriage for females will be 18 years. Even though the legal age for marriage was 16 years in Pakistan, many females got married in their childhood i.e. at ages below 16 years. Pakistan is a developing nation with a low literacy rate. According to the Pakistan Economic Survey, 2018–19, the female literacy rate in Pakistan is 55.8%

Afza Rasul & Jamal Abdul Nasir & Sohail Akhtar & Andrew Hinde, *Factors associated with female age at first marriage: An analysis using all waves of the Pakistan Demographic and Health Survey*, PLOS ONE, pg. 2 (March 15, 2022).[2]

Growing up, Mr. Albert could not openly discuss his thoughts and feelings surrounding his desire to have relationships with his female peers.  Indeed, even mere friendships between males and females were highly frowned upon—any interaction between members of the opposite sex required a minder/chaperone.  In point of fact, when Mr. Albert was roughly twelve years old, his parents caught him speaking on the phone with one of his female peers—whom he met while in the co-ed portion of his schooling—and was severely reprimanded for such "unacceptable" conduct.  The issues related to such a closed-off environment were only compounded when Mr. Albert was sexually abused by a trusted adult family member and friend as detailed in the attached Psychological Evaluation:



**Exhibit 2**, pg. 3 (Psychological Evaluation-Under Seal); PSR. ¶ 78.

In this closed-off and unhealthy environment, Mr. Albert learned and made his first impressions about what constituted acceptable conduct in the realm of sexual relations.  Again,

---

[2] Avalible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8923498/pdf/pone.0264505.pdf (last visited 5/6/2024).

to be clear, Mr. Albert's upbringing is not an excuse for his behavior—and he is not attempting to defend his actions here.  But as this Court is all too aware, sexual abuse and maldevelopment begets future abuse and wrongdoing.  Sadly, Mr. Albert's prosecution is just another example of how this dark and sick cycle continues.

After his family immigrated to the United States in 2012, Mr. Albert's parents enrolled him in a local high school in Queens, New York.  Unfortunately, while in high school, Mr. Albert was the subject of constant harassment and bullying due to his "ethnic" background. Despite this, however, Mr. Albert was able to form several close friendships, graduate, and enroll in college on a partial scholarship.

Following his high school graduation, Mr. Albert's parents moved to Texas, leaving him to largely fend for himself in New York.  During this time, Mr. Albert struggled greatly both financially and mentally.  Being unable to afford on-campus housing, Mr. Albert was initially permitted to live with family friends; however, he was soon forced to find alternative accommodations when these individuals started to charge him rent that he could not afford— despite working jobs as a server in a restaurants and other "gig" type work.  Eventually, Mr. Albert found accommodations in a partially run-down home with eleven other young men, where he stayed for roughly ten to eleven months.  This living situation was hardly ideal for Mr. Albert:



Ex. 2, pg. 4.

The prolific drug use in the house led to the landlord evicting all the tenants, resulting in Mr. Albert being homeless for several days: "Mr. Albert reportedly slept in the college library or other public areas for several days until he found a motel room. He still kept his developing drug addiction and financial crisis a secret from his family. For seven months in 2019, he lived in the basement of a friend of his sister, however the roommate he befriended reportedly turned out to be another drug dealer, and this relationship exacerbated Mr. Albert's drug problem." *Ibid*. Sensing that his life was spiraling out of control, in 2019, Mr. Albert left New York and moved in with his parents in Texas, where he enrolled at the University of Texas—graduating in 2021.

In Texas, Mr. Albert was finally able to "right the ship" and obtain gainful employment, allowing him to become the primary caregiver for his sickly parents. Despite obtaining stable financial footing, Mr. Albert never achieved the social independence or maturity that many of his peers were able to.  Indeed, Mr. Albert's prior traumas and upbringing had a large impact on his emotional and mental maturity, as succinctly stated by Dr. Travis Flower, J.D., Psy. D. in his report to the Court:

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████



Ex. 2, pg. 5 (emphasis added).

Sadly, as previously stated, sexual abuse and maldevelopment precipitates future abuse and wrongdoing.  However, as made clear in the preceding section, Mr. Albert was not simply a predator out to abuse minors.  Instead, his behavior is the product, in large part, of his upbringing—unhealthy notions surrounding relationships and sexual relations— and sexual abuse.  However, if a redeeming aspect of this Case can be found, it is in the fact that Mr. Albert has been finally forced to confront the traumas and miseducation of his youth.  Now, in the light, Mr. Albert can seek the professional help that he has always desperately needed.  Moreover, as the proceeding section makes clear, Mr. Albert now has strong family, community, and professional support in place to live a positive and meaningful life in the future.

    **b.   *Community & Family Support and Personal Characteristics.***

As made readily apparent from the letters of support submitted here, Mr. Albert is known as a profoundly hardworking and caring individual.  *See* **Exhibit 3** (Letters of Support).  He is only twenty-five years old but has positively impacted many people in his community.  Indeed,

what stands out the most in reviewing the numerous letters submitted is how individuals who know Mr. Albert describe his devotion to his family and friends.  Below is a sampling of three such letters:

- A cousin and longtime friend of Mr. Albert states, "Elisha Albert, whom I have known since childhood, is an individual whose brilliance and strong work ethic have consistently pushed him toward several academic and professional accomplishments. Despite the challenges he faces currently, Elisha's commitment to familial responsibilities shows his attitude and care, particularly when caretaking for his elderly parents… Elisha is considered to be, as the youngest and the most favorite person in the family by all. His lively approach and his positive bubbly attitude would make anyone's day better. Not only that but also, his shoulders bear the weight of both financial responsibilities and the emotional well-being of his family." Ex. 3, pg. 01

- Mr. Albert's sister writes, "There are many good qualities about my brother but the one that touches me the most is his inherent quality to "show up" for his family and friends no matter what. A particular example that resonates with me the most is when I wanted to get married to my now husband. Due to different cultural, ethnic, and religious backgrounds my parents were against me getting married to this person for a long time. Jason never gave up on my dream and supported me immensely, even though as a young teenager he didn't have much maturity to understand the situation he continued to convince my parents that I was making the right decision and to support me. My family's support mattered a lot to me and without it I would not have been able to make the most important decision of my life. Without Jason, I don't know if I would have their support at the time… Another example of his great character was when I moved to TX and my husband got stuck out of the country with Covid, Jason not only helped me move, but went to the closing with me and never left my side. He stayed with me in an empty house and slept on the floor for days, so I don't feel alone in a new place." Ex. 3, pg. 04.

- In his heartbreaking letter, Mr. Albert's father writes in-part, "As a father, I bear the weight of seeing my son navigate the complexities of a legal battle. While I do not diminish the gravity of the charges he faces, I implore you to consider Elisha's positive contributions and support to his family. He has been active in Church, community activities, and a leadership role in his school and college. My willingness to write this letter stems from a genuine belief in his capacity for growth, redemption, and the ability to emerge from this challenging chapter as a new person. In my 25 years of experience as Elisha's father, I have never received complaints about his character or behavior. He is the backbone of our family, providing both moral and financial support. His absence, especially as I battle chronic diabetes would be devastating, plunging us further into debts and leading to health complications… I have faith in Jesus Christ that my son will be reunited with us soon. He is not just a defendant in a legal proceeding; he is a son, a caregiver, and a pillar of strength for our family." Ex. 3, pg. 6.

20

Put plainly, Mr. Albert's conduct in this case not only affects him, but will have a lasting impact on his family: Ex. 3, pg. 2 ("[t]he fate of the Albert family intricately intertwines with Elisha's well-being, both financially and morally. In seeking a fair and just sentence, I urge the court to consider the broader narrative of [Mr. Albert's] life[]"); *Ibid*., at 04 ("[Mr. Albert's] absence brings a lot of hardships for my parents; emotional, mental and financial. My parents heavily depended on his earnings in running the house and it has been an extremely tough time on them."); *Ibid*., at 08 ("During the time I got laid off earlier this year and [couldn't] pay the mortgage for the house, [Mr. Albert, my brother] stepped up and took up the financial responsibility… With all these added financial responsibilities he also looked after the needs of our old parents after me and my wife moved out from the house.").  Given this, a variant sentence of no more than what is statutorily required would further the §3553(a) goals of sentencing in this case.

### c. *The Guidelines Range does not reflect an appropriate sentence.*

In general, the Guidelines were developed to reduce sentencing disparity, assure certainty and severity of punishment, and increase the rationality and transparency of punishment.  *See* U.S. SENTENCING COMMISSIONS, Fifteen Years of Guidelines Sentencing, 11-12 (2004).[3] However, when a given guideline is not the result of "the Commission's exercise of its characteristic institutional role," but is instead guided by statutory directives, the sentencing court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve §

---

[3] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

3553(a)'s objections.'" *See, e.g.*, *Kimbrough v United States*, 128 S. Ct. 558, 574-575 (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)); *see also Gall v. United States*, 128 S. Ct. 586, 594, n. 2 (2007) (noting that not all guidelines are tied to empirical evidence).  In cases where guidelines "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that the application of the Guidelines "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Kimbrough*, 128 S.Ct. at 575.

According to the annual statistics published by the United States Sentencing Commission, in Fiscal Year 2023, this District sentenced, on average, 49.0% of all offenders to a sentence within the guidelines range.  *See* UNITED STATES SENTENCING COMMISSION, 2023, Statistical Information Packet for the State of Virginia, pg. 13.[4]  However, the number of defendants within Virginia that received a "Guideline's sentence" fell dramatically when it came to child pornography offenses.  In 2023, the average number of individuals charged with child pornography offenses who were also given a sentence within their applicable Guideline was a mere 23%.  *Ibid.* at 16.  Indeed, in 75.4% of the cases regarding child pornography offenses, there was a variance from the Guidelines themselves.  *Ibid*.

The extreme discrepancy between the Guidelines and the actual sentence given within this District, and indeed nationwide, can be explained by the fact that the CSAM guidelines are not based on empirical research.  In 2003, two attorneys at the Department of Justice persuaded Congressman Tom Feeney to insert drastic changes to the child pornography guidelines by way of an amendment to the Protect Act, Publ L. No. 108-21 (2003).  *See* Skye Phillips, *Protect*

---

[4] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/va23.pdf

*Downward Departures: Congress and the Executive's Intrusion into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004).  These amendments, known as "Feeney" Amendments, effectively revised various guidelines, nullified the ability of judges to consider many downward departures for child pornography defendants and changed the statutory penalties for child pornography offenses.  *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, pp. 18-20 (2009).[5]  These amendments were included in the bill without consultation with the United States Sentencing Commission and were passed by Congress, receiving "virtually no attention or debate." *Ibid.* at 21.  Contained within the Feeney Amendments were direct alternations to U.S.S.G. §§ 2G2.2.

Indeed, the speed in which the child pornography amendments were ushered through the Congress is best summed up by a District Court who commented:

> This stealth route clearly was intended to prevent close scrutiny of the Feeney Amendment, or a fair opportunity to oppose the measure. No emergency mandated acting in such a precipitous manner, without consulting a coordinate Branch of government or allowing opportunity for public input or Congressional debate. The legislative record also is replete with remarks by some members of Congress, and the Attorney General's deputies, expressing hostility toward the Judicial Branch and toward judges who fail to decide cases in the manner favored by those individuals.

*United States v. Detwiler*, 338 F. Supp. 2d 1166, 1172 (D. Or. 2004).

Accordingly, the Guideline for child exploitation offenses is afforded much less deference than other Guidelines categories that are based on the empirical data approach.  *See United States v. Johnson*, 588 F.Supp.2d 997, 1003 (S.D. Iowa 2008) ("[a]s far as this Court can tell, the [child pornography guideline] modifications do not appear to be based on any sort of

---

[5] Mr. Stabenow's article can be found on directly on the United States Sentencing Commission's website, located at: https://www.ussc.gov/education/2016-annual-national-seminar.  (last visited 5/3/2024).

empirical data, and the Court has been unable to locate any particular rationale for them…Thus, because the guidelines at issue in this case do not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, this Court, [] affords them less deference than it would to empirically-grounded guidelines."); *see also United States v. Sudyka*, 2008 WL 1766765, at *8 (D. Neb. Apr. 14, 2008) ("in view of the fact that the child pornography Guidelines are statutorily-driven, as opposed to empirically grounded, the court finds that the Guidelines ranges of imprisonment are a less reliable appraisal of a fair sentence. Because the child pornography Guidelines do not reflect the Sentencing Commission's unique institutional strengths, the court affords them less deference than it would to empirically-grounded guidelines.").

In-fact, it is almost without debate that the vast majority of §2G2.2 and §2G2.1 enhancements apply in nearly all cases involving child pornography.  The United States Sentencing Commission engaged in a multi-year study examining cases of defendants sentenced for federal child pornography offenses and specifically examined the applicability of the current enhancements.  See U.S. SENTENCING COMMISSIONS, *Report To The Congress: Federal Child Pornography Offenses* (2012).[6] The Commission found that because the enhancements for computer use and image volume "now apply to most offenders," the Guidelines at present "fail to differentiate among offenders in terms of their culpability." *Ibid*. at 19.  The overuse of these enhancements, the Commission explained, is due in large part to the fact that when "most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated [] the typical offender obtained child pornography in printed form in the mail." *Ibid*. at 19.

---

[6] Report available at: https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses.

Regarding the use of §2G2.2 enhancements, the commission found that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Ibid*. at 312.  As such, the "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders." *Ibid*. at 358.  Indeed, specifically in regard to §2G2.2(b)(6) (use of a computer), which applied in 96.2 precent of cases, the commission concluded that "2G2.2(b)(6), applies in virtually every case and, thus, fails to differentiate among offenders with respect to their involvement in communities." *Ibid*. at 365.

Moreover, regarding the number of images at issue in any given CSAM case, the Commission recognized:

> The current penalty scheme in non-production cases focuses primarily on an offender's child pornography collection. Three of the six enhancements in §2G2.2 concern the content of offenders' collections: (1) a 2-level enhancement for possession of images of a pre-pubescent minor, (2) a 4-level enhancement for possession of sado-masochistic images or other depictions of violence, and (3) a 2- to 5-level enhancement for collections of a certain number of images (with increments ranging from ten or more images to 600 or more images). Because these three provisions [] now apply to a majority of offenders they add a significant 11-level *cumulative enhancement* based on the content of *the typical offender's collection*.

*Ibid*. at 322-23 (emphasis added).  Given this, the Commission determined that the "current guideline [do] not adequately distinguish among offenders regarding their culpability for their collecting behaviors." *Id*.

The Sentencing Commission is not the only institution to recognize the highly problematic flaws within the current child pornography sentencing scheme.  Indeed, courts around the country have acknowledged the guidelines' current inapplicability to modern cases.

In *United States v. Dorvee*, the Second Circuit surveyed the sentencing statistics for child pornography offenders for a particular year and found that 94.8% of child pornography cases involved an image of a prepubescent minor (two-level increase), 97.2% involved a computer (two-level increase), 73.4% depicted sadistic or masochistic conduct or other forms of violence (four-level increase) and 63.1% involved 600 or more images (five-level increase). 616 F.3d 174, 186 (2nd Cir. 2010).  Given that, the Second Circuit concluded "§ 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant' and violates the principle[] that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct." *Id*. at 187.  *See also United States v. Hanson*, 561 F.Supp.2d 1004, 1009 (E.D.Wisc. 2008) (detailed analysis of §2G2.2 and conclusion that the child pornography guideline "diverges significantly from the Sentencing Commission's typical, empirical approach").  Stated more directly, "the harshness of §2G2.2 is fostering a capricious and dangerous environment." *United States v. Grober*, 595 F.Supp.2d 382, 400 (D.N.J. 2008).

The application of enhancements under §2G2.2(b)(2);(b)(4) and particularly (b)(6) and (b)(7)(D) to Mr. Albert's case does nothing towards the goals of sentencing as laid out in 18 U.S.C. §3553(a).  Instead, these enhancements work towards punishing Mr. Albert more severely for behavior that is exhibited in almost every child pornography offense across the county.  Given that both the United States Sentencing Commission and various courts have recognized current flaws within the various CSAM enhancements, these overly punitive sentencing enhancements should be afforded little to no weight from Mr. Albert's pending sentencing.

### d.  *The Need to Avoid Unnecessary Sentencing Disparities*.

As part of the Court's calculus in arriving at an appropriate sentence, avoiding unwarranted sentence disparities among similarly situated defendants is an important and statutorily mandated factor that any sentencing court must consider in arriving at its ultimate sentencing decision.  *See* 18 U.S.C. § 3553(a)(6).  Considering the sentences received by other CSAM defendants, who engaged in equally (if not more) destructive conduct than that present in the instant case, it becomes clear that the mandatory prison term of fifteen years (180 months) is more than sufficient, and arguably already greater than necessary, to achieve the goals of sentencing in Mr. Albert's case.

In *United States v. Irfan*, 1:19-cr-0120, this Court sentenced the defendant to 150 months of imprisonment followed by 20 years of Supervised Release on two counts: attempted coercion and enticement of a minor and distribution of child pornography.  There the defendant engaged in the following conduct:

- The defendant, an employee of the Fairfax County Public School system, sent videos of himself sexually abusing a five-year-old child to an individual whom the defendant believed was the father of a seven-year-old child as inducement to have the father bring his seven-year-old child to the defendant—so that the defendant could sexually abuse this child as well.  In actuality, the "father" was an undercover agent.

- To further entice the father to offer up his seven-year-old son, the defendant sent the supposed father a video of an adult male anally raping an approximately six-month-old baby.

- Defendant stated that he was sexually ""into all ages, no limits," and that his age preference was "0+," meaning infants and older, but that he "love[d] 5-9," meaning children between five and nine years old.

- The defendant bragged that he had access to children by stating that he worked in "[p]rimary education" and when asked if he had ever done anything with students, he responded: "Things I'll tell you when we meet 😉".

- The defendant set up a time to meet with the "father" so the defendant could exchange his child pornography library for a hands-on sexual encounter with the child. The defendant was arrested at the meet-up.

*Id*. Dkt. 34, pp. 1-5 (Government Position on Sentencing).

In *United States v. Kosanovich*, 3:20-cr-103, this Court sentenced the defendant to 126 of imprisonment followed by 15 years of Supervised Release for attempted coercion and enticement of a minor. There the defendant engaged in the following conduct:

- The defendant, who was 58 years old, engaged in extensive conversations of a sexually-explicit nature with a woman whom he believed was the mother of a 10-year-old-girl for several months. In actuality, the "mother" was an undercover detective.

- The conversations focused on the defendant engaging in a sexual relationship with the 10-year-old girl, as well as the mother. Over the period of the investigation, the defendant sent the undercover officer nude pictures and a prepaid credit card so that the mother could buy certain sex-toys to use with the daughter.

- The defendant drove from Pittsburgh to Richmond for the stated purpose of engaging in a sexual relationship with the mother and daughter, and he was arrested by FBI officials upon his arrival.

*Id*. Dkt. 38, pp. 1-9 (Government Position on Sentencing).

In *United States v. Manring*, 1:13-cr-013, this Court sentenced the defendant to 168 months imprisonment and 3 years of supervised release on two counts of production of child pornography. There the defendant engaged in the following conduct:

- Defendant was a teacher at a preschool in Japan. He filmed himself performing sexual acts on students who were approximately 5 years old. Videos included: defendant giving fellatio to at least 2 unresponsive boys; fondling and stroking the erect penises of at least 3 different boys; approximately 10 kids playing naked and exposing their genitals and anuses; digital penetration of a girl's vagina and anus; fondling a different girl's vagina and anus, as well as pressing his erect penis into the vagina of the girl.

*Id*., Dkt. 29, pp. 1-4.

In *United States v. Camargo*, 1:20-cr-0004, this Court sentenced the defendant to 188 months imprisonment for coercion and enticement of a minor.  There the defendant engaged in the following conduct:

- Following the defendant's arrest after an undercover "meet-up" wherein the defendant thought he was meeting with a fourteen-year-old girl for sex, police discovered that the defendant had, in-fact, been meeting with a fourteen-year-old girl for sex.

- The defendant had been repeatedly engaging with this minor, over the course of six months, in sexually explicit conversations over chat and engaged in sexual intercourse with the young girl on two separate occasions.

*Id*., Dkt. 26, pp. 1-5 (Government Position on Sentencing).

In *United States v. Black*, 1:23-cr-0146, this Court sentenced the defendant to 240 months of imprisonment followed by 20 years of Supervised Release on two counts: conspiracy to produce child pornography and attempted coercion and enticement of a minor.  There the defendant engaged in the following conduct:

- The defendant, an FDIC attorney, was a member of two online groups dedicated to locating prepubescent girls online and convincing the girls to livestream themselves engaging in sexually explicit conduct.

- The defendant shared the spoils of his crime with his co-conspirators—namely, videos of children engaged in sexual acts—and provided them the minors' usernames and helpful tips, so co-conspirators could find these child victims and further exploit them. The defendant and his co-conspirators were recording over 330,000 minors a day, so the number of potential victims is incalculable. This included hacking into baby cameras so members of the group could engage in voyeurism on infant children

- The defendant induced a prepubescent minor to engage in sexually explicit conduct on a live-streaming application while screen-recording that activity. That same month, defendant and a co-conspirator also groomed another prepubescent minor to engage in sexually explicit acts on a photo and video-sharing application. The co-conspirator surreptitiously hacked into that girl's live-video feed and recorded the sexual acts before sending them to defendant.

*Id*., Dkt. 45, pp. 1-11.

Other cases that this Court should consider in determining the most appropriate sentence for Mr. Albert are:

| Case | Offense(s) | Description | Sentence |
|---|---|---|---|
| *US v. Friedel*<br><br>1:14-cr-383-TSE | 18 USC §2251(a) & (e) Production of Child Pornography<br><br>18 USC §2252 Possession of Child Pornography | Defendant enticed at least 5 minors to take and send him sexually explicit images of themselves, including one whom he enticed to have sex, and engage in oral and anal sodomy (and slapped her in the head when she did not stroke his penis after taking it out of her mouth) while referring to her as a "slut," "whore," and "slave" (events that he recorded in videos and images), one to whom he distributed other child pornography, and multiple of whom he threatened with exposure, jail, and parental abandonment if they did not cooperate with his demands. | 16 years; 3 years SR |
| *US v. Velasquez*<br><br>1:13-cr-89 - AJT | 18 USC §2251 Production of Child Pornography (2 counts) | Defendant blackmailed a minor into stripping and masturbating online over a webcam so that he could make video recordings of her. Had previously convinced other minors to engage in sexually explicit conduct on webcams so that he could produce child pornography, and had traveled to engage in sex acts with at least one minor he enticed online. Defendant had been previously been convicted of sexual intercourse with a child 16 years or older in Wisconsin just seven years before his federal offense, who fled the jurisdiction after being released pretrial, and who admitted to having gotten back on-line while a fugitive. | 16 years; 10 years SR |
| *US v. Collins*<br><br>1:14-cr-26 - CMH | 18 USC §2251 Production of Child Pornography | 45 year-old defendant recorded 7 videos of himself engaged in sexual activity with his 11 year-old niece, including the defendant performing fellatio on his niece, attempting to penetrate his niece's vagina with his erect penis, and his niece performing oral sex on him. | 17 ½ years; 5 years SR |
| *US v. Shulick*<br><br>1:08-cr-198-LO | 18 USC §2251 Production of Child Pornography | Middle school teacher met 16 year-old online and engaged in sex acts with her at least 10 times. Photos and videos were found of the victim in his home along with at least 20 images of other children. | 15 years; 10 years SR |

Again, Mr. Albert's actions were inexcusable, and his behavior undoubtedly caused hard. However, to avoid unwarranted disparities this Court should consider the cases cited above; and while each case is unique, when considered as a whole, the above cases and the sentences imposed therein, support the requested variant sentence to the mandatory minimum of 180 months and avoids any unwarranted sentencing disparities in accordance with § 3553(a).

## IV.     Objection to Condition of Supervision

Mr. Albert objects to Standard Condition of Supervision #12 as overly vague.  PSR, pg. 24, ¶12 ("[i]f the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.").

The terms and conditions of supervised release are a substantial imposition on a person's liberty." *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002).  As such, any condition imposed must be precise and clear.  *United States v. Van Donk*, 961 F.3d 314, 323–24 (4th Cir. 2020) ("[a] condition of supervised release is unconstitutionally vague if it doesn't give a probationer "fair notice of the conduct that it punishes" or is "so standardless that it invites arbitrary enforcement.").  Moreover, in order to comply with the requirements of 18 U.S.C. §3583(d), in this Circuit, conditions of supervision must:

> (1) be "reasonably related" to the nature and circumstances of the offense, the history and characteristics of the defendant, and the statutory goals of deterrence, protection of the public, and rehabilitation; (2) involve "no greater deprivation of liberty than is reasonably necessary" to achieve those purposes; and (3) accord with any pertinent Sentencing Commission policy statements.

*United States v. Castellano*, 60 F.4th 217, 225 (4th Cir. 2023).

Here, Standard Condition of Supervision #12 is clearly vague.  The conditions' plain text states that Mr. Albert's "riskiness" is to be decided solely by the probation officer's personal judgment.  This hardly gives Mr. Albert "fair notice of the conduct that it punishes" and is "so standardless that it invites arbitrary enforcement." *Van Donk*, 961 F.3d at 323–24.  Moreover, such a board condition delegates too much-unfettered discretion to the probation officer.  *See States v. Miller*, 341 Fed. App'x 931, 932-33 (4th Cir. 2009) ("[d]etermination of whether a court has improperly delegated the judicial authority of sentencing is based on distinguishing between

the delegation to a probation officer of 'a ministerial act or support service' and the 'ultimate responsibility' of imposing sentence ... it is permissible to delegate to the probation officer [only] the details of where and when [a] condition will be satisfied.") (internal citations and quotations omitted).  As such, Standard Condition of Supervision #12 should be removed or, at the very least, significantly restructured.[7]

## V.     Judicial Recommendation to FCI Seagoville

Though it has only been seven months since Mr. Albert has been incarcerated, he has not been sitting ideally by.  While incarcerated at the Alexandria ADC, Mr. Albert has completed a number of courses to further his life skills and to better prepare him for his life after incarceration: ATSSA Certified Flagger—training to be a "leader in roadway safety;" 5C'S Development Program—training for construction safety; Hard 2 Heart Re-entry—education for those leaving incarceration; and Life learning classes—taught by the Chaplain and focused on re-entry success.  *See* **Exhibit 4** (Certifications of Completion).[8]   On top of the educational background that he already has, **Exhibit 5** (Diplomas and Certifications), Mr. Albert has set himself up to be a successful probationer upon release.

Here, though this Court does not enjoy its' normal discretion in determining the length of Mr. Albert's sentence, given the mandatory minimum sentences, the Court does have the ability

---

[7] Mr. Albert would not object to the modified Standard Instruction #12 given by another judge in this Court in *United States v. Andrus*, 1:20-cr-0134, Dkt. 76, pg. 5 (E.D.V.A. 10/27/21) ("*If the Court* determines in consultation with the probation officer that, based on the criminal record, personal history, and characteristics, and the nature and circumstances of the offense, that the defendant poses a risk of committing further crimes against another person, including an organization, the probation officer may require the defendant to notify the person about the risk, and he must comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk.")

[8] Mr. Albert is awaiting his final Certifications of Completion for Hand 2 Heart and the Life Learning courses, which will be submitted to the Court once received by Counsel.

to make a recommendation to the BOP regarding Mr. Albert's placement within the federal penal system.  *See, e.g.,* 18 U.S.C. § 3621(b)(4)(B) (BOP can designate any facility determined to be "appropriate and suitable, considering," *inter alia*, "any statement by the court that imposed the sentence . . . recommending a type of penal or correctional facility as appropriate").  Though any recommendation that this Court chooses to make is not binding, the BOP is statutorily required to consider such a recommendation when making its ultimate decision regarding Mr. Albert's placement.  *Id.*, § 3621(b)(4)(B) & (b)(5).

The BOP's stated goal is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society," U.S. Dep't of Just., BOP Program Statement P5100.08 (2016),[9] in conjunction with the relevant § 3553(a) factors.  As applied here, it becomes clear that the FCI Seagoville is the most appropriate institution for Mr. Albert to serve his sentence.  FCI Seagoville is close to Mr. Albert's family, and a placement there would not jeopardize his family support network while he was serving his sentence.  Moreover, the facility has sex offender treatment programs and facilities, which given the nature of his background and case, would aid in his rehabilitation.

Additionally, a judicial recommendation for Mr. Albert to participate in the BOP's Residential Drug Abuse Program ("RDAP") is warranted in this case.  As this Court is well aware, RDAP is BOP's "most intensive treatment program. [Cognitive-Behavioral Therapy] ("CBT") is used in a modified therapeutic community model where offenders experience living in a pro-social community. Offenders live in a unit separate from general population; they participate in half-day programming and half-day work, school, or vocational activities. RDAP is

---

[9] Available at: https://www.bop.gov/policy/progstat/5100_008.pdf

typically nine months in duration." Substance Abuse Treatment, Federal Bureau of Prisons (last visited 5/8/2024).[10] Consistent with Mr. Albert's above-stated request, FCI Seagoville offers the RDAP program.

As detailed above, Mr. Albert has had an unfortunate history of substance abuse in his young life.  Given this history of drug abuse and addiction, Dr. Flower has recommended that Mr. Albert receive professional help.  *See* Ex. 2, pg. 6 ███████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████").

**CONCLUSION**

As such, for the aforementioned reasons, Mr. Albert respectfully requests that the PSR be amended in conformity with the corrections and objections detailed above.  Mr. Albert also requests that this Court impose a variant sentence of no more than 180 months of imprisonment (followed by a reasonable period of Supervised Release).  Finally, Mr. Albert requests that this Court provide a recommendation to the BOP in conformity with the housing designation proffered above.

Respectfully submitted,

ELISHA JASON ALBERT,
By Counsel

_____/s/_____
Zachary A. Deubler, Esq. VSB #90669
Yancey Ellis, Esq. VSB #70970
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
zach@carmichaellegal.com
yancey@carmichaellegal.com

---

[10] Available at: https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 9th day of May 2024, a true and accurate of the foregoing was served on all counsel of record via the Court's Electronic Filing System.  I further certify that a copy was also sent by e-mail to Kelly Smihal, Probation Officer, at kelly_smihal@vaep.uscourts.gov.

_____/s/_____
Zachary A. Deubler, Esq.